Christopher STOTTS and Jackie
Stotts, Plaintiffs,

v.

HECKLER & KOCH, INC., Defendant.

No. 00–2899–D.

United States District Court,
W.D. Tennessee,
Western Division.

Jan. 20, 2004.

William M. Monroe, Spicer, Flynn & Rudstrom, Memphis, TN, Bruce D. Brooke, Neely, Green, Fargarson, Brooke & Summers, Memphis, TN, James F. Swindoll, Law Office of James F. Swindoll, Little Rock, AR, for Plaintiffs.

Glen G. Reid, Jr., Wyatt, Tarrant & Combs, Memphis, TN, for Defendant.

## ORDER

DONALD, District Judge.

Before the Court are the parties' motions to exclude expert testimony for failure to meet the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny and Federal Rule of Evidence 702: 1) the motion of Heckler & Koch, Inc. ("Defendant" or "H & K") to exclude the expert testimony of Frank Peretti, M.D.; 2) the motion of Defendant to exclude the expert testimony of Robert Block, Ph.D.; and 3) the motion of Christopher Stotts and Jackie Stotts (collectively "Plaintiffs") to exclude the expert testimony of Michael Shain. For the following reasons, the Court 1) grants in part and denies in part Defendant's motion to exclude the expert testimony of Dr. Peretti, 2) denies Defendant's motion to exclude the expert testimony of Dr. Block,

and 3) denies Plaintiffs' motion to exclude the expert testimony of Mr. Shain.

## I. Background Facts

This is a products liability case based on severe injuries sustained by Mr. Stotts when a gun that he was cleaning discharged, causing a bullet to pass through his right eye and brain. Mr. Stotts was employed as a patrolman with the Horn Lake Police Department ("HLPD") in Mississippi at the time of the incident, but he resided in Tennessee. He carried the gun in his capacity as a police officer. The incident occurred on August 10, 1999, when Mr. Stotts was alone in the kitchen of his home.

### A. The Gun—USP 40, Variant 3

The gun involved is a Model USP 40[1], Variant 3, manufactured and sold by Heckler & Koch GmbH of Oberndorf, Germany. The HLPD purchased the gun after deciding that it was the appropriate weapon for all HLPD officers to carry in the line of duty. Defendant, a Virginia corporation, distributed the gun to the HLPD. This type of gun is restricted to military and law enforcement use.

The gun has an external hammer and an external decock lever. To load it, the user inserts a loaded magazine into the frame in the handle of the gun. By pulling the slide fully to the rear and releasing it, the user chambers a cartridge. When the slide is pulled to the rear, the hammer is cocked and remains cocked. When the slide is then released, it moves forward and feeds a cartridge from the magazine into the chamber.

Once there is a round loaded in the chamber, the user can fire the gun by pulling the trigger. The firing pin causes the cartridge to fire when it is moved forward far enough and with sufficient force to ignite the primer in the center of the cartridge. The gun has two modes, a "double action" and a "single action" mode. In the double action mode, the hammer is not cocked. To fire the pistol in the double action mode, the user pulls the trigger through a full cycle, causing the hammer to cock and then simultaneously fall and strike the firing pin. In this mode, the trigger pull is approximately twelve pounds. In the single action mode, the hammer is already cocked, either by the user pulling the hammer back until it catches in the cocked position, or automatically when the gun is fired and held firmly by the user. To fire the pistol single action, the user pulls the trigger, causing the hammer to fall and strike the firing pin. In this mode, the trigger pull is approximately three pounds.

The USP 40, Variant 3 has a "recycling" process. When the gun is fired and held with a firm grip by the user, the slide cycles to eject the spent cartridge, cock the hammer, and then reload another cartridge into the chamber from the magazine. This allows the gun to be cocked and ready to fire again in the single action mode, with a bullet already in the chamber. The handle of the gun must be obstructed in some way for the gun to reload. A disputed issue of fact in this case is the amount of obstruction to the handle that the gun needs to recycle, i.e. if it can recycle in conditions other than being held in a firm grip.

The gun can be decocked in two ways. One is by depressing the external decock lever, which allows the hammer to fall to the rest position, where it is held away

---

1. Universal Self-loading Pistol 40 caliber. The Court will also refer to the gun as "H & K USP 40."

from the firing pin by internal blocking mechanisms. The other method is called "manual decocking" and involves pulling the hammer back, then pulling the trigger without firing the gun, and continuously holding the trigger back while the hammer is then lowered. The manual decocking method is another contested issue here, including questions of whether the gun was manually decocked during the incident, how manual decocking affects the gun's ability to discharge accidentally, and whether manual decocking is an acceptable way of handling the firearm.

The gun has several internal safety mechanisms, including a hammer block and a firing pin block. The hammer block prevents the hammer from coming into contact with the firing pin, by keeping the hammer in the rest or half-cocked position and blocking it from moving forward. The firing pin block prevents forward motion of the firing pin, thus keeping it from coming into contact with a primer on a cartridge. To disengage the firing pin block, the user pulls the trigger through a full cycle when firing the gun.

## B. The Incident

There are no witnesses to the incident, and Mr. Stotts has no memory of it, so information about the scene is available only from Mrs. Stotts and from the Memphis Police Department ("MPD") investigative reports.

Mr. Stotts was allegedly cleaning his gun in the kitchen of his house went it fired. Mrs. Stotts was in another room of the house and heard the gunshot. She went into the kitchen and found Mr. Stotts seated in a chair at the table with his hands down on the table, slumped over, and with his head resting on his hands. The table was made of formica. Mrs. Stotts observed the gun lying on the pink towel that Mr. Stotts used when he cleaned the gun.

The MPD found the gun cocked and reloaded with a live round in the chamber. It was facing away from Mr. Stotts. The magazine was loaded. The MPD recovered the fired cartridge, which was measured to have an indentation in the primer of .025 inches.

The MPD found a bullet strike and blood on a window frame to the west of the table, fifty-eight inches above the floor. The bullet broke two window panes when it struck the window, after traveling through Mr. Stotts's skull, and there was a dent on the frame between the two broken panes.

Medical records indicate that the bullet traveled essentially a straight-line trajectory through Mr. Stotts's head, from his right eye and out through the top and back, or parietal, area of his skull.

## C. The Motions

On February 3, 2003, Defendant filed this motion to exclude the expert testimony of Dr. Peretti, Plaintiffs' expert. Defendant argues that Dr. Peretti's testimony should be excluded because it is not the product of reliable scientific principles and methods, but it is instead based on assumptions and unsupported speculation. Specifically, Defendant contends that 1) there is no medical evidence to support any particular conclusion about the cause of the incident, and therefore Dr. Peretti's opinion is not the result of a scientific method or the application of scientific or medical principles; 2) Dr. Peretti is not qualified to conduct an accident reconstruction in a firearms case; and 3) Dr. Peretti's opinions are based on assumptions and speculation, in that he ruled out possible explanations and scenarios without any scientific or medical analysis and without any factual support for doing so.

On February 12, 2003, Defendant filed this motion to exclude the expert testimony of Dr. Block, Plaintiffs' expert. Defendant argues that Dr. Block's opinion goes beyond the testing that he performed and his area of expertise, and that it is based on assumptions that are unsupported by the evidence.

On March 5, 2003, Plaintiffs filed this motion to exclude the expert testimony of Mr. Shain, Defendant's expert. Plaintiffs argue that Mr. Shain's tests were performed in an unscientific and unreliable manner and that his opinion is inapplicable to the facts of this case.

The Court heard arguments of counsel and took testimony of Dr. Peretti, Dr. Block, and Mr. Shain in open court on November 25, 2003.

## II. Legal Standard

Federal Rule of Evidence 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702 (2003); *see also Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny.

This standard essentially involves three elements. First, the expert must demonstrate to the trial court that he or she is qualified—"by knowledge, skill, experience, training or education"—to proffer an opinion. Second, by referring to "scientific, technical, or other specialized knowledge," Rule 702 requires "evidentiary reliability" in the principles and methods underlying the expert's testimony. Third, the expert's testimony must assist the trier of fact in that the testimony must "fit" the facts of the case. *See Pride v. BIC Corp.*, 218 F.3d 566, 577–78 (6th Cir.2000); *see also Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786 ("[T]he trial judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.").

"The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Adv. Comm. Note to Rule 702.

As stated by the Third Circuit, proponents "do not have to demonstrate ... that the assessments of their experts are correct, they only have to demonstrate ... that their opinions are reliable ... The evidentiary requirement of reliability is lower than the merits standard of correctness." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir.1994); *see also Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir.1998) ("*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance."). Several factors that the trial court may consider in analyzing the

reliability of an expert's methods are: whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted in the scientific community. *See Pride,* 218 F.3d at 577.

In addition, the rejection of expert testimony is the exception rather than the rule, and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." Adv. Comm. Note to Rule 702 (quoting *United States v. 14.38 Acres of Land, More or Less Situated in Leflore County, Miss.,* 80 F.3d 1074, 1078 (5th Cir.1996)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786.

■ The proponent of the evidence has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. *See* Fed.R.Evid. 104(a) (2003); *Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

### III. The Motions

#### A. Dr. Frank Peretti

■ Dr. Peretti is a forensic pathologist who works for the Arkansas State Crime Laboratory as an Associate Medical Examiner. Prior to his current position in Arkansas, he worked in the Office of the Chief Medical Examiner in Baltimore, Maryland and in the Rhode Island Medical Examiner's Office in Providence, Rhode Island. He has a medical degree and has completed a residency in anatomic pathology and a rotation in forensic pathology. He has passed the qualifying examination in forensic pathology offered by the Amer-

ican Board of Pathology. Dr. Peretti has significant experience with crime scenes, gunshot wounds, and determining causes of death. In the course of his work, he is often called upon to determine whether a person committed suicide or whether gunshot wounds were intentional or accidental. Dr. Peretti has given testimony in many previous cases, involving a variety of deaths or injuries. However, he has no training in engineering, biomechanics, accident reconstruction, or firearms operation or design.

According to his report, dated February 20, 2002, Dr. Peretti is prepared to offer the following opinions:

> It is my opinion that the injuries sustained by Chris Stotts are the result of a single bullet fired from the barrel of H & K USP 40 semiautomatic handgun.... Investigation of the circumstances of death [sic] indicate that the incident was not the result of suicide ideation.
>
> After reconstruction of the scene, the shot probably occurred with the gun at or on the table top. Finally, it is more likely than not that the gun was not grabbed in midair and fired accidentally. Grabbing the gun in midair and discharging simultaneously in the double action mode is virtually not possible. Based on review of the medical records and reconstruction of the scene, it is more likely than not that the gun discharged when dropped.

(Report of Dr. Frank Peretti of 2/20/02 ("Peretti Report"), at 1–2.) Plaintiffs summarize Dr. Peretti's work as providing four opinions: 1) that the event was neither a suicide nor the act of another party; 2) that Mr. Stotts was probably injured by an accidental discharge; 3) that the bullet traveled from on or about the table top through the head of Mr. Stotts and hit a window behind and to the right of Mr.

Stotts; and 4) that it was physically more likely than not that the weapon dropped and discharged than that it was fumbled and grabbed by Mr. Stotts, causing it to discharge. (Pls.' Resp. & Mem. to Def.'s Mot. to Exclude Expert Test. of Frank Peretti at 5.)

In arriving at his opinions, Dr. Peretti used 1) MPD reports, 2) MPD photographs, 3) medical records and CAT scans from the Regional Medical Center of Memphis, 4) a discussion with Mrs. Stotts, 5) a review of Dr. Block's photographs and reports, 6) a telephone conversation with Dr. Block, and 7) a visit to the scene of the incident with re-establishment of the scene and photographs with comparisons to the police reports and photographs. (Peretti Report, at 1.)

In testimony to the Court, Dr. Peretti described how Mr. Stotts's medical records, specifically the x-rays and CAT scans, assisted Dr. Peretti in determining the trajectory of the bullet. The CAT scans show the essentially straight path of the bullet as it traveled through the skull and brain, and medical operative reports confirm the direction of the path. The CAT scans do not show any evidence of the bullet being deflected or ricocheting in the skull, although a fragment of the bullet was recovered in the skull. It is common for forensic pathologists to assess the trajectory of a bullet through a body.

Dr. Peretti also described how the bullet went through the pupil of Mr. Stotts's right eye without damaging the eyelid. This observation is confirmed by photographs. Dr. Peretti testified that the lack of damage to the eyelid shows that the bullet entered Mr. Stotts's eye in a matter of milliseconds, because he did not have time to flinch, which would have closed the eyelid and caused it to be damaged by the bullet. Further, Dr. Peretti stated that, in all of the gunshot wound cases that he has seen, he has never before seen one without damage to the eyelid. He testified that in homicide and suicide cases, victims tend to close their eyes as an involuntary response when the bullet is discharged, thus leading to damage to the eyelid as well as the eye.

Dr. Peretti testified to three reasons why he ruled out a suicide attempt in this case based on his medical knowledge and experience. First, it is extremely atypical for a suicide victim to shoot himself or herself in the eye. Second, suicide victims usually close their eyes, but Mr. Stotts's eyes were open, as shown by the lack of damage to the eyelid. Third, there was no stippling, or gun powder burns, on Mr. Stotts, nor was there significant damage to the face apart from the eye, indicating that the gun fired at a distance of at least eighteen to twenty-two inches away from Mr. Stotts.[2] This is an atypically large distance for a suicide victim. Dr. James Flemming, the eye surgeon who performed the surgery on Mr. Stotts, confirmed the lack of powder burns.

Dr. Peretti ruled out a homicide attempt by relying on the MPD investigative reports. He testified, based on his experience with thousands of homicides by shooting or other means, that a homicide attempt was unlikely, because the MPD made no arrests and turned the gun back over to the HLPD, and there was no mention that another person was involved.

Dr. Peretti went to the scene of the incident and attempted to restage the shooting based on the MPD report and Mrs. Stotts's observations. Using a person to stand in for Mr. Stotts, Dr. Peretti

---

**2.** The approximate distance of the gun from Mr. Stotts was determined by test-firing the gun to ascertain the stippling patterns at various firing distances and by an approximating formula based on the measurements of the gun.

attempted to draw the path of the bullet using the entry and exit points in Mr. Stotts's head and the strike point of the bullet on the window. In so doing, he connected a point near the top of the kitchen table in a line to the strike point on the window. His recreation of the scene was based on an assumption that Mr. Stotts was seated at the table in the same position in which he was found when the gun was fired, rather than that he was standing up, reaching across the table, or sitting in a different position. Dr. Peretti assumed this based on what he was told and on the final strike point of the bullet in the window. To symbolize the gun in his reconstruction, Dr. Peretti used a cardboard model that was much thinner than the actual gun. He is unable to ascertain the angle at which the gun struck the table or the angle at which the bullet hit the window.

Dr. Peretti testified that his opinion was that the shot probably emanated from on or about the table top, based on the trajectory that he plotted. In his deposition, however, he stated that the gun could have fired anywhere from the table top up to three feet off the table. Further, he stated that, without knowing Mr. Stotts's position at the moment the gun was fired, one cannot know whether the gun was at or above the table top when it fired.

He also testified that he did not believe that a scenario in which Mr. Stotts dropped the gun and grabbed it in midair, causing it to fire, was likely, as opposed to a scenario in which Mr. Stotts dropped the gun, and it fired upon impact with the table. First, testimony provided by Dr. Block had established that the gun would fire on impact. Second, Dr. Peretti opined that it was virtually impossible to drop the gun, then put a finger past the trigger guard and onto the trigger, and pull the trigger, causing the gun to discharge in the double action mode, in the split second timing involved here.

Dr. Peretti did not find any medical or forensic evidence indicating whether the gun was cocked or decocked or whether it was in the single or double action mode when it discharged. He assumed it was in the double action mode because someone allegedly told him that it was, however, it is impossible to know whether it was in the single or double action mode at the time of the incident. He stated that, if the gun was cocked and in the single action mode, it would not be virtually impossible for a person to drop it, fumble to catch it, and fire it accidentally.

After examining Dr. Peretti's qualifications and analysis of the available evidence, the Court holds that, while he will be permitted to testify as to certain aspects of his proposed opinion, some of his proffered opinions are inadmissible.

First, Dr. Peretti, as a trained medical doctor, is clearly qualified to interpret medical records, operative reports, x-rays, CAT scans, and the like. A layperson does not possess similar interpretive skills. It is from such records that Dr. Peretti formed his opinion that the bullet went in essentially a straight-line trajectory through Mr. Stotts's head and to the window. Further, Dr. Peretti's experience with gunshot cases and training as a forensic pathologist assists him in reconstructing bullet paths. The Court finds no problem with his methods of determining or attempting to recreate the trajectory of the bullet through Mr. Stotts's skull. Therefore, Dr. Peretti's opinion is admissible expert testimony on the issue of the trajectory of the bullet through Mr. Stotts's head and to the window.

Second, Dr. Peretti's opinion that the gunshot wound was not the result of a suicide attempt is well-founded in his extensive experience as a forensic pathologist

and is based on facts culled from the investigative and medical reports. Dr. Peretti based this opinion on clearly identifiable facts, including that there was no damage to the eyelid or parts of the face other than the eye and that there was no stippling on the face. Dr. Peretti testified about his extensive experience in thousands of gunshot wound cases, and he drew from this specialized experience to identify aspects of the situation that were atypical for suicide cases. This opinion is therefore not speculative, nor is it easily arrived at by a non-expert, and Dr. Peretti is qualified to make it. Also, ruling out suicide will help the trier of fact to arrive at a conclusion on causation here. This opinion clearly meets the standards for admissibility of expert testimony.

Third, Dr. Peretti may testify to his opinion that Mr. Stotts was not shot by another person. Dr. Peretti's reasons for ruling out a homicide scenario were based on the lack of mention of a second-party suspect in the MPD's investigative reports, the failure to make an arrest for the shooting, the fact that the gun was turned back over to the HLPD, and the lack of damage to the eyelid. Reading the MPD reports and noting the lack of an arrest does not take specialized knowledge; any conclusion based on them alone would be, as Dr. Peretti stated in his deposition, from common sense. Dr. Peretti's observation of the lack of damage to the eyelid, however, and his knowledge that that is atypical for a homicide victim, is something that a layperson could not analyze. Contrary to Defendant's assertion that anyone, even a person with no specialized training, could have arrived at this determination, Dr. Peretti's specialized knowledge and training as a forensic pathologist are skills that helped him to use the available facts to rule out a homicide attempt. Ruling out homicide well help the trier of fact arrive at a determination as to causation. The

Court therefore holds that the Rule 702 standards have been met as to this issue and that Dr. Peretti may testify as to his opinion that a second party was not the cause of Mr. Stotts's injuries.

Fourth, however, Dr. Peretti's opinion that the shot probably occurred with the gun at or near the table top is based purely on assumptions as to the underlying facts, and thus is unreliable speculation. In order to position the gun at or near the table top, Dr. Peretti assumed that Mr. Stotts was seated at the table when the gun fired. His basis for so assuming was that someone allegedly told him that Mr. Stotts was sitting, that Mr. Stotts was found seated at the table after being shot, and the position of the strike point in the window. No witness observed the incident, however, so no one could have definitively told Dr. Peretti what Mr. Stotts's position was when he was shot. Also, even though Mr. Stotts was seated at the table when discovered after being shot, nothing rules out the possibility that he was standing above the table and simply fell down into the chair upon being shot. As Dr. Peretti himself pointed out, Mr. Stotts would have lost all motor abilities immediately upon the bullet's entrance into his brain and therefore might not have held himself in the same position that he was in when the gun fired. Dr. Peretti's assumption that Mr. Stotts was seated when the gun went off is pure speculation and therefore provides a less than solid basis for his resulting opinion as to the position of the gun when it fired. Further, Dr. Peretti stated in his deposition that it was impossible to know how Mr. Stotts was positioned when he was shot and that, without that knowledge, it was also impossible to determine where the gun was when it went off. According to his deposition testimony, the gun could have been anywhere from on the table top to three feet above the table top

when it fired, a range in which the circumstances causing the incident could differ significantly. Finally, as to the strike point of the bullet in the window, Dr. Peretti's testimony showed only that a line could have been drawn from that point in the window to any point toward the table. Since the position of Mr. Stotts's head, through which the bullet traveled, is unknown, the three points of entry, exit, and window do not provide any basis for drawing a line from the window to any particular point of firing. In other words, while it is clear that the bullet went through Mr. Stotts's right eye and skull and hit the window, there is no way to know where Mr. Stotts's eye and skull were positioned when he was shot, and therefore it is impossible to connect the window strike point to any other points or to extend a line from the window to any certain firing point. Dr. Peretti's opinion as to the position of the gun is therefore not based on reliable methodology, but only on assumed facts and speculation. Furthermore, it is of no assistance to the trier of fact, since it does not help to resolve any issue of fact; simply substituting a different set of assumptions could lead to an equally possible position for the gun. The Court holds that this aspect of Dr. Peretti's opinion does not meet the Rule 702 standard of admissibility and that Dr. Peretti may not testify as to the position of the gun when it fired.

Fifth, Dr. Peretti opines that grabbing the gun in midair and discharging it simultaneously is virtually impossible in the double action mode. This is due to the increased trigger pull of twelve pounds when the gun is in the double action mode, in addition to the protection provided by the trigger guard. Dr. Peretti has cited sufficient reasoning to support this opinion, and it is helpful to the trier of fact in that it supports the exclusion of a particular scenario. The Court holds that he may testify generally to his opinion of the difficulty of firing the gun in the double action mode in a drop and grab scenario.

Sixth, however, Dr. Peretti offered no evidence supporting his assumption that the gun was in the double action mode, other than that someone allegedly told him it was. He admitted in his deposition that it was impossible to know whether the gun was in the single or double action mode, or cocked or decocked. Those variables would change the level of force needed to pull the trigger, thus making it more or less easy to pull the gun in a scenario in which the gun was dropped, grabbed by the user, and accidentally discharged. Without any evidence one way or the other as to the mode the gun was in, Dr. Peretti's proposed scenario is no more probable than many other possible scenarios. Given the lack of evidence as to the state of the gun, the Court holds that Dr. Peretti may not testify to any opinion regarding the mode or cocked vs. decocked state that the gun was in at the time of the shooting or regarding the ease of pulling the trigger in the actual circumstances in which Mr. Stotts was shot.

Finally, Dr. Peretti offers his opinion as to the ultimate issue of causation in this case: he opines that it is more likely than not that the gun discharged by being dropped, rather than that it was grabbed in mid-air and fired accidentally. This determination appears to be based primarily on his opinion that it is virtually impossible to grab the gun and discharge it simultaneously in the double action mode. As stated above, however, it is impossible to know the state of the gun when it fired. Without knowing whether the gun was in the double action mode, Dr. Peretti has no way of determining whether it was more likely that the gun discharged when dropped as opposed to being grabbed in mid-air and fired accidentally. Since the impossibility of pulling the trigger in the

drop and grab scenario in the double action mode appears to be his main basis for choosing between the two scenarios, and since there is no way to know whether the gun was in that mode when it fired, Dr. Peretti's opinion as to the probability of either scenario lacks evidentiary reliability. It is not well-reasoned but instead is a purely speculative assessment of the incident. The Court holds that Dr. Peretti may not testify as to the probability that the gun discharged when dropped or the probability that the gun was dropped, grabbed in mid-air, and discharged accidentally.

In summary, the Court holds that Dr. Peretti may provide expert testimony regarding his opinion of 1) the trajectory of the bullet through Mr. Stotts's skull and to the window, 2) the probability that the gunshot wound was not the result of a suicide attempt, 3) the probability that the gunshot wound was not the result of a homicide attempt, and 4) the ease or difficulty of pulling the trigger in the double action mode in a drop and grab scenario generally. The Court holds that Dr. Peretti may not provide expert testimony regarding his opinion of 1) the probability that the shot occurred with the gun at or near the table top, 2) the ease of pulling the trigger in the circumstances in which the gun was actually fired, 3) the single vs. double action mode or cocked vs. decocked state of the gun at the time of the shooting, and 4) the probability that the gun discharged when dropped or the probability that the gun was dropped, grabbed in mid-air, and fired accidentally. The Court bases this holding primarily on the unsupported assumptions, lack of evidence, and lack of scientific reasoning supporting the methodology by which Dr. Peretti founded his opinions on those matters. The Court notes that this partial exclusion is not an indictment of Dr. Peretti but merely a holding that his proffered testimony does not meet the Rule 702 standard in some respects.

## B. Dr. Robert Block

██ Dr. Block is Professor Emeritus of metallurgical engineering at the University of Oklahoma and is the C.E.O. of Associated Metallurgists, an Engineering Consulting Company. He taught for twenty-seven years before retiring as a professor. He has a Ph.D. with a major in metallurgical engineering and minors in physics and chemistry from the University of Illinois. He is a registered professional engineer in Oklahoma. He has worked as a consultant to many companies in the firearms manufacturing industry, as well as in other industries. With regard to the firearms industry, Dr. Block has consulted as to the materials used in gun manufacturing and, in hundreds of cases, on litigation involving guns that failed during use or had accidental discharges.

Plaintiffs hired Dr. Block to determine the existence of any defects or malfunctions of the firearm that injured Mr. Stotts such as could have caused the gun to fire unintentionally. In his first report, dated November 21, 2001, Dr. Block offered the following conclusions:

1. The evidence H & K USP firearm is capable of malfunctioning when the hammer is lowered manually from the cocked position.

2. The malfunction which was obtained makes the pistol susceptible to firing if dropped.

3. The operator's manual does not warn against manual decocking of the H & R[sic] USP firearm.

4. Indentations observed on the firing pin indicate past malfunctioning(s) of the pistol in a manner not associated with manual decocking of the hammer.

(Report of Dr. Robert Block of 11/21/2001, at 7.) According to this initial report, Dr. Block examined 1) the firearm that injured Mr. Stotts, 2) the fired cartridge case, 3) the spent bullet fired in the accident, 4) live .40 cal. S & W, Winchester cartridges, 5) a miniature light bulb, apparently used for cleaning the gun, 6) two high capacity magazines for the H & K USP firearm, 7) live Remington—Peters .40 cal. S & W cartridges, 8) a compact H & K USP firearm, and 9) the H & K USP owner's manual.

In a second report dated March 4, 2002, Dr. Block stated the following conclusions and opinions:

1. The findings presented in the November 21, 2001, Report of Findings are adopted.

2. The sensitivity range of primers that are used in pistol and revolver ammunition indicate that the pistol, fully loaded with fourteen rounds of ammunition, is capable of discharging when dropped directly on the hammer from a height of more than seven-eighths of an inch when the hammer is manually lowered past its rest position.

3. It is my opinion, to a reasonable degree of engineering certainty, that the accident that resulted in Christopher Gary Stotts [sic] injury was the result of a blow to the hammer of the pistol that occurred after manually lowering the hammer past its normal rest position thereby rendering the firing pin block inoperative.

4. It is my opinion that the Heckler & Koch USP pistol is defective and unreasonably dangerous beyond the expectation of the ordinary user because the hammer can be manually lowered and inadvertently placed forward of its rest position, thereby rendering the pistol susceptible to firing if dropped upon its hammer.

5. It is my opinion that the instructions and warnings that accompanied the H & K USP pistol are defective because they fail to advise the user of dangers that are associated with manually lowering the hammer from the cocked position past its rest position.

6. A pattern of powder stippling would be present at the wound site if the muzzle of the pistol had been held closer than eighteen inches at the time the pistol discharged.

(Report of Dr. Robert Block of 3/4/2002, at 4.) For this report, Dr. Block also reviewed 1) videotape deposition testimony of J.W. Johnson, 2) the MPD LAW Incident Table & Supplement, 3) the H & K USP armorer's manual, 4) Defendant's Response to Request for Production of Documents, 5) the H & K USP operator's manual, 6) the H & K USP compact pistol operator's manual, 7) Responses of Defendant to Plaintiffs' First Set of Interrogatories, and 8) Primed Case Sensitivity, Characteristics—Centerfire Pistol and Revolver, Small Arms and Ammunition Manufacturers' Institute ("SAAMI") Technical Committee Manual. Dr. Block also talked with Mrs. Stotts and examined the MPD investigative reports from the incident.

Plaintiffs summarize Dr. Block's work as providing four opinions: 1) that the weapon discharge that injured Mr. Stotts resulted from a blow to the hammer of the gun, which occurred after manually lowering the hammer past its normal rest position, rendering the firing pin block inoperative; 2) that it was probably an accidental discharge that injured Mr. Stotts; 3) that the pistol was susceptible to firing if dropped, rendering it defective; and 4) that the gun was defective for not containing warnings of the dangers associated with manual decocking. (Pls.' Resp. & Legal Mem. to Def.'s Mot. to Exclude Expert Test. of Robert Block, Ph.D. at 2.)

In testimony to the Court, Dr. Block described parts of the gun, particularly the internal safety mechanisms that are intended to prevent the gun from firing because of a blow to the hammer. He also described the SAAMI standard providing that a drop fire[3] should never happen. The SAAMI standard provides for a guided drop test, in which a gun's capacity to drop fire is tested by purposely dropping the gun to hit on its hammer or by holding the gun steady and dropping a weight on the hammer.

In assessing the capacity of the subject gun to shoot unintentionally, Dr. Block performed several tests. First, he measured the gun's trigger pull, or the distance that the trigger has to move before the gun discharges. Evaluating the trigger force displacement is a typical test for evaluating a firearm. Second, Dr. Block test fired the gun both with the ammunition that was involved in the incident and with other ammunition. Third, he and a technician from H & K disassembled the gun and cleaned some of its parts. Fourth, Dr. Block measured the indentations in primers from test firings and in the primer of the shell that was discharged when Mr. Stotts was shot. Fifth, Dr. Block measured the spring forces that return the hammer and that operate on the firing pin. Dr. Block documented his work.

Dr. Block used the spring force measurements to calculate the acceleration forces of the gun and found that the likelihood that the gun would generally fire when dropped was very remote.

Dr. Block described to the Court the process of energy transfer that causes a gun to fire. Because the energy that causes the gun to fire is a product of force and distance, the speed at which the primer is pushed in is as important to determining whether the gun will fire as is the force that is applied. There is thus a range of energies at which different primers will ignite, and it is not possible to define a single energy that will cause the gun to fire. At the opposing ends of that range of energies, there is a "no fire" point—at which the gun will never fire— and an "all fire" point—at which the gun will always fire.

Dr. Block also described a test that enables one to determine if the firing pin block has been defeated, allowing the firing pin to reach the primer, by looking at whether the primer was marked (every time a cartridge is fired, the primer will be indented some amount). Dr. Block found that when the gun used here was manually decocked, it could allow the hammer to go forward of the rest position, beyond the internal safeties, thus causing the firing pin to mark the primer. He found this to be so, even though the gun is designed to prevent that firing from happening; in other words, the gun's safety mechanisms are intended to work reliably by preventing accidental discharges at all times. Dr. Block demonstrated to the Court how, when a gun is manually decocked by manually lowering the hammer, if the catch stays up and the firing pin block is pushed up and out of the way of the firing pin, the firing pin can then go forward and indent the cartridge.

Dr. Block then described five tests that he performed in which the gun was dropped in the manually decocked state on a wooden block, with the gun guided to impact the hammer upon falling from a height of two feet.[4] Guiding the drop en-

---

**3.** Dr. Block defined a "drop fire" as a situation in which the gun discharges unintentionally by a blow to the hammer or to the mechanism.

**4.** The SAAMI standard for these drop tests is

sures that impacts upon the hammer are evaluated and allows for reproducibility or repetition of the tests. He videotaped some of these tests, and the Court reviewed those tapes. In the first, third, and fourth tests, the gun did not fire. In the fifth test, the gun did drop fire. In the second test, Dr. Block tied the trigger back, and the gun did drop fire. These drop tests simulated impacts to the hammer by anything that would transfer energy to the hammer. By knowing the energy that is transferred to the hammer during impact and the minimum energy at which the gun will fire, the test results can be used to determine whether the gun will fire at other angles of impact.

Dr. Block's opinion was that, because the gun did drop fire during his tests, when manually decocked and with the hammer pushed past the rest position, it is capable of firing upon impact to the hammer. As such, it does not meet the requirements of the SAAMI standard in that specific position. The SAAMI standard, however, does not specifically address manual decocking. Also, Dr. Block stated that if the hammer was not put past the rest position, then the gun would probably meet the SAAMI standard. Also, if the automatic decock is used, the primer would not be indented.

He did not test the capacity of the gun to recycle when fired in these test situations.

Dr. Block examined the operator's manual and armorer's manual for the H & K USP 40. He then compared those manuals to other guns' manuals that discussed safety devices, warnings, and handling of the weapons. He found that the manual for the H & K compact pistol contained warnings against manually decocking the weapon, as did the manuals for the Ruger series, the Walther, and the SIGARMS. Some of these other manuals also warned of the guns' ability to fire upon dropping.

He also testified that manufacturers and those experienced in the firearms industry know that manual decocking is something that gun users still do, even though it is unnecessary on newer weapons.

Dr. Block tested the stippling pattern of the gun. He did this by firing test cartridges at white pieces of paper from various distances to assess the powder burns they produced. As the muzzle moves further away from the target, the tightness and density of the pattern is reduced. According to his tests, from eighteen inches away, one would not be reasonably able to determine a stippling pattern.

Dr. Block testified that the methods that he used to test the gun are recognized and used by experts in the firearms industry.

The Court holds that Dr. Block's expert testimony meets the Rule 702 and *Daubert* standards and therefore may be admitted as to all issues on which he has proffered an opinion. First, Dr. Block is eminently qualified to render an opinion on possible defects or malfunctions with this gun, both from his educational and professional experience and from his expertise gained in many years of consulting with the firearms industry on both firearm design and accidental firearm injuries. In addition, the skills that he used here encompass fields of inquiry that a non-expert could not analyze without assistance.

from a height of four feet onto a steel block. Using a wooden block allows some of the energy to be absorbed by the wood, as it receives the impact, whereas using a steel block allows all of the energy to go to the hammer. Also, dropping from a higher distance creates more energy upon impact. Thus, the drop fires in Dr. Block's tests occurred at lower energies than would be produced under the SAAMI standard tests.

Second, Dr. Block demonstrated that the methods he used in arriving at his conclusions were reliable. He discussed his testing processes thoroughly and documented them, so another examiner could replicate his experiments. Also, he explained that the methodology he used is also used by others in the industry, as shown by its incorporation in the SAAMI standards. Whether Defendant's expert, Mr. Shain, arrived at different conclusions in his drop tests, as discussed below, is irrelevant at this stage; under Rule 702, the Court does not assess the merits, or correctness, of Dr. Block's findings, but only their evidentiary reliability. *See In re Paoli*, 35 F.3d at 744.

Third, Dr. Block's opinions are helpful to the trier of fact, in that they go to the disputed issue of causation. An essential question in this case is the ability of the gun to drop fire on impact, as opposed to its ability to fire if dropped and grabbed by the user. Dr. Block's opinions, based on reliable methodology, assess the ability of the gun to drop fire in particular situations. An opinion one way or the other on this issue will help the trier of fact to determine what was the most likely cause of the gunshot here.

Defendant argues against the admissibility of Dr. Block's opinions by pointing out that there is no evidence that the hammer was manually lowered, that the pistol was dropped, or that the pistol was fired after being dropped. That may be true, however, it is precisely because there is no concrete evidence as to exactly how the gun fired in this case that each side presents experts. Dr. Block's opinions assist the trier of fact by using reliable testing to ascertain what he believes to be the more likely scenario. As the Court stated above, it is not necessary for the Court to decide whether his opinions reflect the correct scenario, but rather whether the

methods that he used to reach his opinions are reliable.

Defendant also argues that Dr. Block's opinions fail to address certain "facts" in the case, specifically 1) that the pistol had a new round in the chamber after firing the shot that injured Mr. Stotts, yet, according to Defendant, the pistol cannot recycle a new round into the chamber if dropped rather than held; 2) that Mr. Stotts's police training and his practice as observed by other police officers were to use the decocking lever to lower the hammer, rather than to manually decock the gun; and 3) that the shot that injured Mr. Stotts went thought his head and struck the window at a steep angle, but Dr. Block's drop tests only got the pistol to fire by dropping it at an angle perpendicular to the table. The Court first notes that there is evidence in the record contrary to each of Defendant's so-called "facts," with the exception of the presence of a bullet in the chamber after the injurious shot was fired. More importantly, however, that factual weaknesses may eventually be shown in Dr. Block's opinions does not require the Court to bar his testimony at this stage. Such concerns go to the weight, not the admissibility, of his testimony. *See McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir.2000). Similarly, the fact that Defendant's expert assessed aspects of the situation that were left unexplained by Dr. Block, such as the presence of a bullet in the chamber of the gun after Mr. Stotts was shot, goes to weight and not admissibility. Defendant may cross-examine or offer a competing expert to point out weaknesses in the expert's testimony.

■ Defendant also argues that, because Dr. Block did not perform the drop tests prior to writing his reports, the testimony should be excluded. The Federal Rules of Evidence, however, do not require

experts to perform independent testing. *See* Fed.R.Evid. 703 (2003); *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. Also, Dr. Block testified to the extensive independent testing that he later performed, which confirmed the opinions stated in his reports.

Defendant argues that Dr. Block's use of a guided fall test, rather than a free fall test, causes his opinion not to fit the facts of the case. "Fit" of an expert's opinion goes to the question of helpfulness to the trier of fact; the Court has already determined that an assessment of the gun's ability to drop fire helps the fact-finder establish causation. As to the methodology used, first, Dr. Block's tests were designed to assess the capacity of the gun to fire upon impact to the hammer in a particular set of conditions, and he used the appropriate methodology to assess that specific capacity. It is clear from his explanation that, in order to test whether the gun will fire upon impact to the hammer, one must ensure that the hammer is actually impacted. Guiding the gun's drop allowed Dr. Block to cause an impact to the hammer, thus allowing him to test the question he set out to answer. Second, he testified that his methods are used by others in the industry and are incorporated into the SAAMI standards for gun safety. Third, Dr. Block's use of a guided fall allows his tests to be repeated by others, which is a common way of verifying the accuracy of scientific experiments. The fact that his tests were set up in laboratory conditions, rather than in a free-fall state, thus does not bar admissibility.

For the foregoing reasons, the Court holds that Dr. Block's proposed expert testimony meets the requirements of Rule 702. The Court therefore denies Defendant's motion to exclude Dr. Block's expert testimony.

## C. Michael Shain

■ Mr. Shain is a former Los Angeles policeman who served as a firearms instructor and range master for eight years. As a police supervisor, criminal investigator, and O.I.C. of Internal Affairs, he participated in the investigation of various shootings. He is an FBI-certified firearms instructor, with training in the characteristics of semi-automatic and fully automatic pistols. He has personal experience with semi-automatic pistols, including the identification of maintenance and repair issues and the investigation of unintentional discharges. In the past ten years, he has served as a firearms safety and function consultant in firearms litigation, specifically in determining the cause of shootings and how the design and handling characteristics of guns could have affected the incidents involved. Defendant hired him to assess the gun's capacity to fire when dropped and to provide an understanding of the technical function and operation of a USP 40.

In a report dated June 10, 2002, Mr. Shain opined that:

> Christopher Stotts' injury is not the result of a drop induced hammer impact discharge.
>
> A. The physical evidence found at the scene and an empirical evaluation of the firearm's functional characteristics do not support the possibility that Christopher Stotts dropped the H & K Universal Self–Loading Pistol, (USP,) .40 on its' [sic] hammer resulting in a discharge of a live round of ammunition that struck him in the eye.

(Report of Michael Shain of 6/10/02, at 4.) Mr. Shain reviewed the following materials in preparing his opinion: 1) MPD investigative reports; 2) MPD crime scene photographs; 3) Dr. Peretti's photographs; 4) measurements and diagram of the scene of the shooting provided by Defendant's

counsel; 5) Dr. Block's deposition and his reports of November 21, 2001 and March 4, 2002; 6) James Porter's deposition; and 7) Darryl Whaley's[5] deposition. Mr. Shain also conducted the following tests and research: 1) examination of like/kind H & K .40 USP; 2) drop tests of like/kind H & K .40 USP; and 3) angle calculations and trajectory analysis of potential hammer impact discharge of H & K .40 USP, based on scene measurements. (*Id.* at 2–3.)

In testimony to the Court, Mr. Shain described the internal processes and parts involved in firing the gun and in decocking the gun by using the external lever.

In preparing his expert report, Mr. Shain disassembled and examined a gun of a type similar to the one that injured Mr. Stotts; the sample gun differed in part because it had an external safety mechanism not present on the gun used in the incident. He measured the amount of travel of the firing pin block plunger and the control latch and concluded that, when the hammer is manually decocked, the control latch had a travel that was less than the minimum travel required to un-block the firing pin.

He then conducted drop tests of the sample pistol, dropping it thirty times from a height of twenty-two to twenty-four inches onto a maple block. He dropped the gun with a remote mechanical drop device that did not guide the gun to land on the hammer on each drop. The pistol was manually decocked before each drop and oriented with the hammer down at various angles that were intended to maximize the impact directly on the hammer. No discharge resulted from any of the thirty drops. The primers did show evidence of a slight firing pin indentation on some of the drops, which Mr. Shain observed was consistent with impeded movement of the firing pin. Mr. Shain videotaped the drop tests. From these tests, Mr. Shain concluded that the hammer would not drop fire, even when manually decocked.

Mr. Shain then conducted a second set of drop tests, after removing the firing pin block mechanism. On the fourth drop, with the pistol manually decocked, the pistol discharged. Mr. Shain opines that the presence of the firing pin block in the gun keeps the gun from firing when manually decocked and dropped.

Mr. Shain then conducted a third set of drop tests, in which he discharged a live-round of ammunition as the result of a hammer impact drop on a manually decocked gun, to determine if the pistol would recycle after an impact discharge. After one discharge with the sample gun, Mr. Shain determined that the expended case had not been extracted or ejected from the gun, that the hammer was still forward of the rest position and not cocked, and that the slide had not cycled. Mr. Shain concluded that it is not possible for the gun to recycle if fired due to a drop with hammer impact. If the grip and frame of the gun are not supported, as he believes they are not in a drop fire situation, the slide will be unable to pick up a new round from the magazine and return all the way forward. Mr. Shain later repeated this set of tests with the actual gun that shot Mr. Stotts, dropping it onto a formica table. He dropped the gun ten times, it discharged all ten times, and it did not recycle on any of those ten drops. He claims that, if the slide of a semiautomatic gun is obstructed in any way, it will not recycle properly. He opines that the presence of a live round in the chamber of the gun at the scene indicates that it was

---

5. Darryl Whaley is the police chief for the HLPD.

not drop fired, because it would not have recycled under those conditions.

To determine the angle of discharge, Mr. Shain put a cardboard cover over the dropping device and measured the angle of the live round discharged during the drop test. He found the angle to be between sixty-three and seventy degrees. He found this number inconsistent with the strike point in the window of the Stotts's kitchen and the location of the pistol as found on the table. Mr. Shain determined that the maximum angle at which the dropped gun could have hit the hammer would have produced a bullet strike higher than that found on the window or would have required the gun to drop to the end of the table where Mr. Stotts was not positioned.

Mr. Shain also described to the Court the differing primer indentations obtained with a trigger pull fire as opposed to a drop fire. With a trigger fire, the indentation is larger. Mr. Shain pointed out that Dr. Block obtained smaller primer indentations on his tests of a drop fire than was found on the primer of the bullet that shot Mr. Stotts. Mr. Shain did not measure the indentations on the cases used in his test firings. He did observe that there is evidence that the firing pin hits the primer when the gun is dropped, depending on the condition of the gun.

Mr. Shain's summary opinion is that the shot that hit Mr. Stotts occurred as the result of a trigger pull, and not from a drop-induced impact.

The Court holds that Mr. Shain meets the standards for an expert witness under Rule 702 and that he may testify as to all issues on which he has proffered an opinion. First, Mr. Shain's years of professional experience and training with semi-automatic firearms provide him with knowledge of the subjects about which he proposes to testify, specifically the design and characteristics of the USP 40 semi-automatic firearm. These are specialized subjects about which a layperson is unfamiliar, at least to the extent necessary to understand the issues in this case.

Second, Mr. Shain demonstrated that his methodology is reliable. Plaintiffs argue that the lack of documentation of the specific details of Mr. Shain's tests renders them unreliable. Although the exact details of each drop were not recorded (i.e., the exact height from which the pistol was dropped, the exact angle at which it was let go, etc.), and those details would have been helpful in confirming the accuracy of his results, the tests were video-taped, which offers some capability for repetition by others and examination of Mr. Shain's methods. In addition, Mr. Shain repeated his tests several times, and that repetition provides an adequate foundation for his opinions at the admissibility stage.

Furthermore, because Mr. Shain attempted to evaluate what would happen to a gun when dropped freely, or from an unguided position, a certain lack of detail is to be expected; the free state of the drop indicates that the exact parameters of each drop would be unknown. Although the Court previously found Dr. Block's guided drop to be reliable, the Court also finds Mr. Shain's methodology reliable, regardless of the un-guided drop, because it tests a somewhat different question. The different results that the two experts reached under the differing test conditions go to the weight of their testimony, not to admissibility.

Plaintiffs also claim that Mr. Shain's secrecy about the dropping device that he designed and used argues against admissibility. While Mr. Shain may not have wanted other firearms experts to "steal" his design, he did video-tape it, and therefore the design is now available for others

to see. Plaintiffs' concerns over this secrecy are therefore irrelevant. The secrecy of the testing device does mean that the device itself has never been evaluated by other firearms experts, but the Court finds that Mr. Shain has adequately explained the procedures behind it, such that its uniqueness is excusable.

Third, Mr. Shain's opinions fit the facts of the case and are helpful to the trier of fact. His opinions, concerning the ability of the gun to fire when dropped and to recycle after an impact discharge, go directly to disputed issues of fact in this case, specifically how the gun fired the shot that injured Mr. Stotts and how a live round ended up in the chamber after the shooting. Mr. Shain applied his theories directly to undisputed facts in the case in order to arrive at his opinions.

For the foregoing reasons, the Court holds that Mr. Shain's expert testimony is admissible under Rule 702 and therefore denies Plaintiffs' motion to exclude Mr. Shain's testimony.

## IV. Additional Matters

During oral argument, Defendant objected to the admission of the Affidavit of Jackie Stotts, dated March 14, 2002. According to Defendant, the materials attested to in the affidavit contradict the sworn testimony provided in Mrs. Stotts's deposition. Defendant argues that the affidavit, or both the affidavit and the deposition testimony, are therefore inadmissible under *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453 (6th Cir.1986) (holding that nonmoving party cannot create a genuine issue of material fact so as to defeat a motion for summary judgment by submitting, after motion for summary judgment is made, an affidavit that contradicts prior deposition testimony).

One premise of this rule of exclusion is that the later affidavit actually contradicts the prior testimony. The Court does not have before it the portion of the deposition testimony in which Defendant contends that Mrs. Stotts contradicted herself in the later affidavit. The Court declines to presume that the two statements are contradictory, and therefore declines to rule on this matter until after having reviewed the subject testimony.

## V. Conclusion

1. For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion to exclude the expert testimony of Dr. Peretti. The Court holds that only certain portions of Dr. Peretti's proffered testimony meet the requirements of Rule 702. The Court therefore excludes those portions of his opinion that rely on unsupported assumptions, lack of evidence, and lack of scientific reasoning.

2. The Court **DENIES** Defendant's motion to exclude the expert testimony of Dr. Block, holding that Dr. Block's proffered testimony meets the standard of admissibility under Rule 702 and *Daubert*.

3. The Court **DENIES** Plaintiffs' motion to exclude the expert testimony of Mr. Shain, holding that Mr. Shain's proffered testimony meets the standard of admissibility under Rule 702 and *Daubert*.